# STATE OF IDAHO

Office of the Attorney General

RAÚL R. LABRADOR

March 12, 2024

**Via Electronic Filing**

Molly C. Dwyer, Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

RE: *Planned Parenthood Great Northwest, Hawaii, Alaska, et al. v. Raúl Labrador, et al.*, Case No. 23-35518
    Scheduled for oral argument on March 27, 2024

Dear Ms. Dwyer,

    Interpretation and enforcement are not the same thing.

    Appellees' letter focuses on interpretation, arguing the Appellees have standing because "AG Labrador has refused to disavow his *interpretation*" of Idaho's Defense of Life Act. Dkt. #64 at 1 (emphasis added). Their argument echoes the district court, which said the Attorney General could have proved there was no case or controversy simply by "denounc[ing]" his prior "interpretation." 1-ER-055–056.

    But Appellees' supplemental authority, *Peach Ranch LLC v. Bonta*, says nothing about disavowing any "interpretation." *See* 93 F.4th 482, 489–90 (9th Cir. 2024). To the contrary, it held that plaintiffs had standing because of "the enforcing authority's [un]willingness to disavow *enforcement*." *Id.* at 490 (emphasis added).

    In this case, the Attorney General has publicly disavowed any authority to *enforce* the Defense of Life Act against Appellees or anyone else:

> The Legislature has not granted the Attorney General any authority to prosecute violations of [the Defense of Life Act]. Thus, the Idaho Attorney General may bring or assist in a prosecution under [the Act] only if specifically requested by a county prosecutor pursuant to an appointment made by a district court . . . .

3-ER-317. Seeking a stay, he later told the district court that "he has not enforced the interpretation [at issue], is not enforcing it, and will not enforce it." 3-ER-134.

These disavowals are exactly what was missing in *Peace Ranch*, where no party disputed that California's attorney general could enforce the statute if he chose. *See* 93 F.4th at 490. In California, the attorney general can initiate prosecutions whenever he believes that "any law of the State is not being adequately enforced in any county," Cal. Const. art. V § 13, but in Idaho, Attorney General Labrador neither possesses nor claims any such authority.

Because the Attorney General has disavowed both the authority to enforce the statute and the intention to enforce the statute against Appellees, *Peach Ranch* confirms that the Appellees lack standing.

*The body of this letter contains 325 words.*

Respectfully submitting,

Alan M. Hurst
Solicitor General
(208) 332-3548
*Counsel for Raúl Labrador, et al.*

93 F.4th 482
United States Court of Appeals, Ninth Circuit.

PEACE RANCH, LLC, Plaintiff-Appellant,

v.

Rob BONTA, in his official capacity as Attorney General of the State of California, Defendant-Appellee,

and

Gavin Newsom, Defendant.

No. 22-16063
|
Argued and Submitted October 5, 2023 San Francisco, California
|
Filed February 13, 2024

**Synopsis**
**Background:** Owner of mobile-home park brought pre-enforcement action against California Attorney General and Governor, seeking declaratory relief and injunction against enforcement of newly enacted mobile-home rent control statute, which owner alleged violated constitutional provisions including equal protection clause. The United States District Court for the Eastern District of California, John A. Mendez, J., 2022 WL 2670035, granted defendants' motion to dismiss. Owner appealed.

**Holdings:** The Court of Appeals, McKeown, Circuit Judge, held that:

owner sufficiently alleged intention to engage in course of conduct arguably affected with constitutional interest, supporting finding that owner had injury in fact that could support Article III standing;

possibility that owner's park was not covered by scope of rent control law did not preclude owner from satisfying injury-in-fact requirement of Article III standing; and

owner demonstrated substantial threat of enforcement of law, as required to satisfy injury-in-fact requirement of Article III standing.

Reversed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Lack of Subject Matter Jurisdiction.

 *484  Appeal from the United States District Court for the Eastern District of California, John A. Mendez, District Judge, Presiding, D.C. No. 2:21-cv-01651-JAM-AC

**Attorneys and Law Firms**

Paul J. Beard, II (argued), FisherBroyles LLP, Los Angeles, California; Peter S. Bauman, Callahan & Blaine APLC, Santa Ana, California; for Plaintiff-Appellant.

Megan A.S. Richards (argued), Deputy Attorney General; P. Patty Li, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; California Attorney General's Office, Sacramento, California; for Defendant-Appellee.

Before: [M. Margaret McKeown](#), [Richard C. Tallman](#), and [Kenneth K. Lee](#), Circuit Judges.

## OPINION

[McKEOWN](#), Circuit Judge:

This appeal requires us to address a question of pre-enforcement standing. Peace Ranch LLC ("Peace Ranch") sued the California Attorney General and Governor to enjoin the enforcement of AB 978, a mobilehome-rent-control statute.[1] Peace Ranch claims that if it raises mobilehome rents more than AB 978 allows, the Attorney General will enforce AB 978 against it and seek sanctions. This is the prototypical posture of a pre-enforcement standing case, but Peace Ranch adds one unusual wrinkle. The complaint also alleges, in the alternative, that AB 978 does not apply to Peace Ranch's mobilehome park. The Attorney General seizes upon this latter allegation, arguing that Peace Ranch cannot state a pre-enforcement injury if it also alleges that the statute is inapplicable. The parties dispute whether AB 978 applies to Peace Ranch, and resolution of that factual and legal dispute awaits further litigation.

*485 This peculiar posture unearths a nuance of pre-enforcement standing: Is a pre-enforcement injury the threat of enforcement or the threat of *successful* enforcement? We conclude that the substantial threat of enforcement, and not the likelihood that any such enforcement action would ultimately lead to sanctions, drives our analysis. Here, Peace Ranch has a choice: raise rents and face a costly enforcement action or forego a rent increase and conform to a law that may not apply. Peace Ranch is indeed stuck between rock and a hard place—the precise dilemma that supports pre-enforcement standing. Accordingly, we reverse the district court's dismissal for lack of standing.

## FACTUAL BACKGROUND

In 2019, Peace Ranch acquired the Rancho La Paz mobilehome park, which straddles two cites in Orange County, Anaheim and Fullerton.[2] Shortly after the purchase, Peace Ranch attempted to raise rents on plots, but there was significant tenant and political pushback.[3] As a result, Peace Ranch and its tenants renegotiated a phased-in schedule of rent increases. Still, the rent increases garnered considerable public controversy in Anaheim and Fullerton. Mobilehome rent control ordinances were introduced in both cities but were ultimately voted down.

Following that defeat, a California state assembly member for Fullerton took the matter to the state legislature. Initially, she introduced a statewide mobilehome park rent control statute, but the bill died in committee. In February 2021, she tried again, this time introducing a narrower bill: AB 978. This effort succeeded, and AB 978 went into effect in January 2022. Among other things, AB 978 prohibits a "qualified mobilehome park" from raising plot rent more than 3% plus the percentage change in cost of living or 5%, whichever is lower. Crucially, the law narrowly defines "qualified mobilehome park" as "a mobilehome park ... that is located within and governed by the jurisdictions of two or more incorporated cities."

The amended complaint alleges that AB 978 targets only Peace Ranch. The preamble of AB 978 reads, "In enacting this legislation, it is the intent of the Legislature to protect mobilehome owners in qualified mobilehome parks that have been subject to rent increases that reside in *486 counties with populations between 2,500,000 and 3,250,000 according to the last census count." Peace Ranch alleges that Orange County's population is 3,186,989 according to the 2020 census, and no other California county's population falls into that range. In Orange County, only Peace Ranch is "located within and governed by the jurisdictions of two or more incorporated cities." Accordingly, Peace Ranch concludes, "[The bill's sponsors] wrote AB 978 in hopes of ensuring that only Peace Ranch would be subject to the law."

Despite the targeted drafting, a controversy remains over whether Peace Ranch is a single mobilehome *park*, as it is referred to colloquially, or two separate *parks*. Peace Ranch alleges, "While Peace Ranch believes [Rancho La Paz] is actually two separate parks (one in Anaheim and the other in Fullerton), both the Legislature *and* Defendant Attorney General ... believe that Rancho La Paz is a single park straddling two cities and is therefore subject to AB 978."

**PROCEDURAL BACKGROUND**

Peace Ranch brought an action seeking declaratory and injunctive relief, nominal damages, and attorneys' fees. The initial complaint alleges violations of the constitutional prohibition on Bills of Attainder, the Contracts Clause, the Equal Protection Clause, the Due Process Clause, and the Takings Clause. The Attorney General moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of standing and 12(b)(6) for failure to state a claim.

The district court granted the motion to dismiss, reasoning that AB 978 does not apply to Peace Ranch because, accepting the complaint allegations as true, Peace Ranch does not own a "qualified mobilehome park." *Peace Ranch LLC v. Newsom*, No. 2:21-CV-01651-JAM-AC, 2022 WL 378264, at *3 (E.D. Cal. Feb. 8, 2022). There was, therefore, no "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000)).

Peace Ranch then amended its complaint to emphasize that its injury stemmed from the Attorney General's position that AB 978 applies to Peace Ranch. The district court rejected this argument and granted the Attorney General's renewed motion to dismiss, this time with prejudice. *Peace Ranch LLC v. Bonta*, No. 2:21-CV-01651-JAM-AC, 2022 WL 2670035, at *2 (E.D. Cal. July 11, 2022). The district court reiterated: "Because Plaintiff continues to allege [Rancho La Paz] is 'actually two separate parks ...,' it does not meet the criteria of a 'qualified mobilehome park.' Plaintiff's choice to comply with AB 978 is irrelevant. Voluntary compliance with a law that does not apply does not constitute an injury-in-fact." *Id.* The district court did not reach the merits under the Rule 12(b)(6) motion.

**ANALYSIS**

**I. THE CONTOURS OF PRE-ENFORCEMENT STANDING**

The contours of standing have shifted and changed over time, but the crux of the inquiry has not wavered: whether "conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945). To establish "the irreducible constitutional minimum of standing," Peace Ranch must establish "injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury." **\*487** *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Pre-enforcement injury is a special subset of injury-in-fact. Typically, plaintiffs must allege an injury at the time of filing. For pre-enforcement plaintiffs, the injury is the anticipated enforcement of the challenged statute in the future. One need not violate a criminal law and risk prosecution in order to challenge the law's constitutionality. *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). This principle applies equally in the civil context. See *Lopez*, 630 F.3d at 786 ("The threatened state action need not necessarily be a prosecution.").

Courts have adopted various metaphors to encapsulate the dilemma facing a pre-enforcement plaintiff—"the rock ... and the hard place," [4] "the Scylla ... and the Charybdis," [5] and the choice to comply or "bet the farm." [6] In 2000, the Ninth Circuit articulated a three-prong test for pre-enforcement standing:

> In evaluating the genuineness of a claimed threat of prosecution, we look to whether the plaintiffs have articulated a "concrete plan" to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute.

*Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).

Nearly fifteen years later, in *Susan B. Anthony List v. Driehaus*, the Supreme Court articulated a different framework, albeit incorporating part of the essence of the Ninth Circuit test. 573 U.S. 149, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014). A plaintiff must first allege "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Id.* at 161, 134 S.Ct. 2334 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). The intended future conduct must be "arguably ... proscribed by [the challenged] statute." *Id.* at 162, 134 S.Ct. 2334 (quoting *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301). And finally, the threat of future enforcement must be "substantial." *Id.* at 164, 134 S.Ct. 2334. We adopt the Supreme Court's framework, although we acknowledge that the Ninth Circuit has toggled between these two tests. [7] Compare *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022), with *Clark v. City of Seattle*, 899 F.3d 802, 813 (9th Cir. 2018).

**II. APPLICATION OF THE *DRIEHAUS* TEST TO PEACE RANCH'S PRE-ENFORCEMENT STANDING**

We review de novo the district court's order granting the motion to dismiss for lack of standing. **\*488** *Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 416–17 (9th Cir. 2020). Because this case was dismissed at the pleading stage, our analysis is based on the allegations of the amended complaint, which we accept as true. *See Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011).

### A. Intention to Engage in a Course of Conduct Arguably Affected with a Constitutional Interest

Peace Ranch must first establish that it has "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 161, 134 S.Ct. 2334. We have no trouble concluding that Peace Ranch meets this prong of the test.

In *Driehaus*, plaintiffs challenged an Ohio election law prohibiting "false statements" during political campaigns. *Id.* at 151, 134 S.Ct. 2334. They pleaded "specific statements [the plaintiffs] intend to make in future election cycles" and arguably "false" previous statements. *Id.* at 161, 134 S.Ct. 2334. The Court held these allegations were sufficient to meet the first prong of its pre-enforcement standing test.

Importantly, a plaintiff need not plan to break the law. The concept of "intention" is more counterfactual than practical. That is to say, courts must ask whether the plaintiff would have the intention to engage in the proscribed conduct, were it not proscribed. A good example of this principle is found in *Bland v. Fessler*, 88 F.3d 729 (9th Cir. 1996). Bland used an automated dialing system in his business, in violation of California law. *Id.* at 731. After being issued a warning, he stopped using it, which "cut his income by 50% and caused him to lay off three employees." *Id.* at 737. Instead of violating the law, he followed a course much like Peace Ranch.

> Bland chose to obey both the civil and utilities statutes and to bring a declaratory action challenging their constitutionality, rather than to violate the law, await an enforcement action against him, and raise the statutes' constitutionality as a defense. Bland's decision was altogether reasonable and demonstrates a

> commendable respect for the rule of law. Under the circumstances of this case, Bland should be allowed to test the law.

*Id.*

Like Bland and the plaintiffs in *Driehaus*, Peace Ranch specifically pleads its intent and alleges corroborating past practice. Before the passage of AB 978, Peace Ranch raised rents on its mobilehome plots more than five percent. Peace Ranch alleges that after AB 978 went into effect, "to avoid injury in the form of an action seeking to enforce AB 978 and associated penalties based on the [Attorney General's] belief that [Rancho La Paz] is a single park, Peace Ranch has been forced to conform its conduct to the mandates of AB 978." And so, it has adequately alleged an "intention to engage in a course of conduct."

The "course of conduct" must also be "arguably affected with a constitutional interest," but this inquiry does not require us to engage in a mini litigation of the claims. Rather, "the Supreme Court has cautioned that standing 'in no way depends on the merits' and has instructed us to take as true all material allegations in the complaint and construe the complaint in favor of the plaintiff." *Yellen*, 34 F.4th at 849 (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Under Peace Ranch's theories, the ability to raise rents arguably affects a constitutional interest. Thus, the allegations are sufficient to meet the first *Driehaus* prong.

**\*489 B. Conduct Arguably Proscribed by the Statute**

Peace Ranch's intended future conduct must be "arguably ... proscribed by [the] statute" it wishes to challenge. *Driehaus*, 573 U.S. at 162, 134 S.Ct. 2334 (quoting *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301). This is where the unique quirks of this appeal come into play.

In an effort to preserve future arguments, both parties dance around whether Rancho La Paz is a single mobilehome park straddling two cities or two mobilehome parks, one in each city. Hedging its bets, Peace Ranch alternatively claims that it is a single park (and thus is subject to AB 978) or two parks (and thus escapes the confines of AB 978). The amended complaint describes Rancho La Paz as a "park straddl[ing] two cities" and also alleges that "Peace Ranch believes [Rancho La Paz] is actually two separate parks (one in Anaheim and the other in Fullerton)." In its opening brief, Peace Ranch explains that these allegations "preserve an alternative argument for a future enforcement or other proceeding." For its part, Peace Ranch is clear on one point—it wants to raise the rents.

The Attorney General maintains that Peace Ranch's allegation of two parks destroys its standing. There can be, the argument goes, no pre-enforcement standing if the statute does not apply to Peace Ranch.

The Supreme Court has provided some insight that guides our analysis. In *Federal Election Commission v. Cruz*, Senator Ted Cruz and his campaign entity, Ted Cruz for Senate ("Committee"), filed suit against the FEC, alleging that a particular campaign finance law ("Section 304") was unconstitutional. 596 U.S. 289, 293, 142 S.Ct. 1638, 212 L.Ed.2d 654 (2022). The Court noted an "Alice in Wonderland air" about the parties' arguments with "the Government arguing that appellees would *not* violate the statute by repaying Cruz, and [Cruz and the Committee] arguing that they *would*." *Id.* at 299–300, 142 S.Ct. 1638. While the parties in *Cruz* squabbled over niche jurisdictional issues, the Court outlined a much simpler theory of standing: "[T]his case has unfolded in an unusual way. After all, Cruz and the Committee likely would have had standing to bring a pre-enforcement challenge (as they do now) to Section 304 in a much easier manner—by simply alleging and credibly demonstrating that Cruz wished to loan his campaign an amount larger than $250,000, but would not do so only because the loan-repayment limitation made it unlikely that such amount would be repaid." *Id.* at 300, 142 S.Ct. 1638 (citing *Driehaus*, 573 U.S. at 158–59, 134 S.Ct. 2334).

We are faced with similarly "unusual" facts. In order to establish standing, the would-be sanctioned party, Peace Ranch, must argue that the law *does* apply, while the would-be enforcing party, the Attorney General, could defeat standing by conceding that the law does *not* apply. But there is no need to go "further down this rabbit hole." *Id.* at 301, 142 S.Ct. 1638. We can avoid this pickle—an inquiry that seems to unavoidably tangle standing with the merits. One purpose of pre-enforcement standing is to ensure that no law is practically unchallengeable. The risk of being sued by the state will deter many plaintiffs from testing their luck. Thus, the relevant question is whether Peace Ranch plausibly alleged that it refrained from raising rents because of the Attorney General's interpretation of AB 978. The answer is yes and the second *Driehaus* prong is met.

### C. Substantial Threat of Enforcement

Finally, Peace Ranch must demonstrate a "substantial threat" of enforcement. **\*490** *Driehaus*, 573 U.S. at 164, 134 S.Ct. 2334. This final prong often rises or falls with the enforcing authority's willingness to disavow enforcement. *See LSO*, 205 F.3d at 1154–56 ("While we cannot go so far as to say that a plaintiff has standing whenever the Government refuses to rule out use of the challenged provision, failure to disavow 'is an attitudinal factor the net effect of which would seem to impart some substance to the fears of [plaintiffs].' " (quoting *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991))); *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) ("Here, the state's refusal to disavow enforcement ... is strong evidence that the state intends to enforce the law and that [the plaintiffs] face a credible threat.").

Here, the Attorney General not only refuses to disavow its intent to enforce but also admits that the law targets Peace Ranch. To be sure, the Attorney General stops short of stating its intention to enforce AB 978 against Peace Ranch, and his briefing diligently avoids taking a stance. But at oral argument, the Attorney General's counsel was asked, "Are you able to commit that the state won't enforce the law against Peace Ranch, if Peace Ranch raises the rents more than five percent?" Tellingly, she replied, "No." By the Attorney General's own admission, the Legislature had Peace Ranch "in mind" when it enacted AB 978. We cannot ignore the Legislature's clear targeting of Peace Ranch and the Attorney General's answer at oral argument. This is enough to substantiate the threat and satisfy the final *Driehaus* prong.

### CONCLUSION

In sum, Peace Ranch has adequately pled standing based on *Driehaus*. Because we hold that Peace Ranch has standing under a pre-enforcement injury theory, we decline to reach Peace Ranch's alternative standing theory based on the cost of compliance with AB 978.

**REVERSED.**

**All Citations**

93 F.4th 482, 2024 Daily Journal D.A.R. 1263

### Footnotes

1  AB 978 treats "mobilehome" as a single word while the Supreme Court and more common usage use "mobile home." Because we are dealing with the California legislation, we adopt "mobilehome."

2  At issue is the Rancho La Paz park owned by Peace Ranch. For ease of reference, we use the Peace Ranch moniker to refer to the park.

3    The Supreme Court summed up the relationship between mobilehome owners and mobilehome park owners in *Yee v. City of Escondido*:

> The term "mobile home" is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.

503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (citations omitted). This "peculiar characteristic" puts mobilehome owners in a uniquely weak bargaining position: If they wish to continue living in the home that they own, they must pay whatever rental price the park owner sets. *See Guggenheim v. City of Goleta*, 638 F.3d 1111, 1114 (9th Cir. 2010) (en banc). In this way, the park owner has each tenant "over a barrel." *Id.*

4    *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996).

5    *Steffel*, 415 U.S. at 462, 94 S.Ct. 1209.

6    *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007).

7    The Attorney General argues that we ought to disregard any caselaw analyzing standing for First Amendment claims due to the "unique standing considerations" in that context. True enough, "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO*, 205 F.3d at 1155. But this argument goes too far. We are mindful that a different standard applies to First Amendment standing, but these precedents remain instructive in understanding the principles of pre-enforcement standing.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.